**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

DEANGELO LAMONT MITCHELL,

Plaintiff,

v.

KATIE FRAKER, *et al.,*

Defendants.

Case No. 3:24-CV-00153-CLB

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

[ECF No. 32, 34]

This case involves a civil rights action filed by Plaintiff DeAngelo Lamont Mitchell ("Mitchell") against Defendant Nethanjah Breitenbach ("Breitenbach"). Currently pending before the Court are Mitchell's motion for summary judgment, (ECF No. 32),[1] and Breitenbach's motion for summary judgment, (ECF No. 34).[2] For the reasons stated below, Mitchell's motion for summary judgment, (ECF No. 32), is denied and Breitenbach's motion for summary judgment, (ECF No. 34), is granted.

**I.    BACKGROUND**

**A.    Procedural History**

On April 1, 2024, Mitchell filed a civil rights complaint under 42 U.S.C. § 1983 and an application to proceed *in forma pauperis* for events which occurred while incarcerated with the Nevada Department of Corrections ("NDOC") at Northern Nevada Correctional Center ("NNCC"). (ECF Nos. 1, 1-1.) The Court screened the complaint pursuant to 28 U.S.C. § 1915A(a) and allowed Mitchell to proceed on a First Amendment access to information claim against Breitenbach. (ECF No. 17.) The parties have now filed competing motions for summary judgment. (ECF Nos. 32, 34.)

///

---

[1]    Breitenbach responded, (ECF No. 36), and Mitchell did not reply.

[2]    Mitchell responded, (ECF No. 37), and Breitenbach replied. (ECF No. 38.)

**B.    Factual Background[3]**

On July 6, 2023, Mitchell made a records request to the Nevada Board of Parole Commissioners ("Parole Board") seeking an official copy of his codefendant's parole orders. (ECF No. 8 at 28, 39.) Specifically, Mitchell requested "a copy of each and every order of the [Parole] Board's 'Risk Assesment' for inmate Shauntay J. Wheaton #68329 and Board's decisions to grant or deny him parole." (*Id.* at 39.) Mitchell sought the documents for use in a potential civil rights lawsuit concerning his sentence and the Supreme Court's decision in *Graham v. Florida*, 560 U.S. 48 (2010).[4] (*Id.* at 27-28.)

The Parole Board responded to Mitchell's request by sending the requested Parole Orders to the NNCC Warden's office and a letter to Mitchell stating where the documents were sent and that Mitchell should contact the Warden for review. (*Id.*) The Parole Board also sent a letter to Breitenbach, NNCC's Warden, regarding Mitchell's document request and explaining that the boxes were being sent to Breitenbach, not Mitchell, because they "do not believe these could (or should) be sent directly to [Mitchell]." (*Id.* at 41.)

After receiving the Parole Board's letter, Mitchell sent a kite to Breitenbach asking that the documents be "turned over to me in a forthwith fashion" on July 23, 2023. (*Id.* at 43.) Breitenbach responded, stating that all public records requests must go through the office of the Public Information Officer ("PIO") and provided the address for the PIO. (*Id.*)

Breitenbach provided a sworn declaration explaining that in July of 2023, she received a banker's box of records containing approximately 5,000 pages of various offender's records for Mitchell from the Parole Board. (ECF No. 34-1 at 2.) Breitenbach explains these records contained other inmate's social security numbers, dates of birth, and other confidential and personal information. (*Id.* at 3.) Breitenbach consulted with a Deputy Director and the PIO for further guidance, and both agreed that providing Mitchell

---

[3]    The facts as stated herein are undisputed unless otherwise noted by the Court.

[4]    The Court notes that Mitchell sought to bring a claim for denial of access to the courts based on this contemplated civil rights lawsuit. (*See* ECF No. 8.) However, the Court dismissed those claims with prejudice because Mitchell could not allege a colorable claim under *Graham*. (ECF No. 7 at 6-9.)

with the documents would violate NDOC Administrative Regulation ("AR") 750, AR 120, and AR 722 and would be inappropriate due to safety, security, and confidentiality concerns. (*Id.*) Shortly after responding to Mitchell's grievance directing him to contact the PIO, Breitenbach became the Warden of Lovelock Correctional Center and had no further contact with Mitchell regarding the documents. (*Id.*)

AR 711(3)(B) states that "[i]nstitutions/facilities will not permit the possession of personal property that is not specifically authorized." AR 750.03(2) prohibits inmates from receiving, *from any source*, confidential information, which includes but is not limited to, personal information about current or past inmates and any other person without that person's knowledge and written consent. Confidential inmate information includes individual inmate records such as I-files, grievances, legal documents, inmate institutional behavior records, C-files, and personal information such as date of birth, place of birth, and social security number. AR 120.08(3)(F)-(G). Per AR 120.08(4), requests for records containing inmate information will be referred to the Correctional Case Records Manager of the Offender Management Division.

Breitenbach explains in her declaration that AR 750.03 and AR 120.08 serve the goal of protecting an inmate's confidential and personal information, which is important because there are "hosts of Security Threat Group classifications (gang affiliations) within NDOC institutions whereby current and former members of rival gangs are prohibited from housing or interacting with one another for purposes of preventing violent acts and offender-on-offender violence." (ECF No. 34-1 at 3.) Thus, inmates are prohibited from possessing the personal and confidential information of other inmates to prevent inmates from gleaning information about rivals in other gangs to facilitate attacks on them, whether during incarceration or after release. (*Id.*) The exception to the rule prohibiting inmates from possessing records of other inmates is when one inmate specifically authorizes, in writing, that another inmate may provide assistance with preparation of legal documents, pursuant to AR 722.04(8)-(9). (*Id.*)

///

## II.      LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The substantive law applicable to the claim or claims determines which facts are material. *Coles v. Eagle*, 704 F.3d 624, 628 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). Only disputes over facts that address the main legal question of the suit can preclude summary judgment, and factual disputes that are irrelevant are not material. *Frlekin v. Apple, Inc.*, 979 F.3d 639, 644 (9th Cir. 2020). A dispute is "genuine" only where a reasonable jury could find for the nonmoving party. *Anderson*, 477 U.S. at 248.

The parties subject to a motion for summary judgment must: (1) cite facts from the record, including but not limited to depositions, documents, and declarations, and then (2) "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Conclusory statements, speculative opinions, pleading allegations, or other assertions uncorroborated by facts are insufficient to establish the absence or presence of a genuine dispute. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019).

The moving party bears the initial burden of demonstrating an absence of a genuine dispute. *Soremekun*, 509 F.3d at 984. "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Id*. However, if the moving party does not bear the burden of proof at trial, the moving party may meet their initial burden by demonstrating either: (1) there is an absence of evidence to support an essential element of the nonmoving party's claim or claims; or (2) submitting

admissible evidence that establishes the record forecloses the possibility of a reasonable jury finding in favor of the nonmoving party. *See Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 593-94 (9th Cir. 2018); *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The court views all evidence and any inferences arising therefrom in the light most favorable to the nonmoving party. *Colwell v. Bannister*, 763 F.3d 1060, 1065 (9th Cir. 2014). If the moving party does not meet its burden for summary judgment, the nonmoving party is not required to provide evidentiary materials to oppose the motion, and the court will deny summary judgment. *Celotex*, 477 U.S. at 322-23.

Where the moving party has met its burden, however, the burden shifts to the nonmoving party to establish that a genuine issue of material fact actually exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, (1986). The nonmoving party must "go beyond the pleadings" to meet this burden. *Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897 (9th Cir. 2021) (internal quotation omitted). In other words, the nonmoving party may not simply rely upon the allegations or denials of its pleadings; rather, they must tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. *See* Fed. R. Civ. P. 56(c); *Matsushita,* 475 U.S. at 586 n. 11. This burden is "not a light one," and requires the nonmoving party to "show more than the mere existence of a scintilla of evidence." *Id.* (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)). The non-moving party "must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Pac. Gulf Shipping Co.*, 992 F.3d at 898 (quoting *Oracle Corp. Sec. Litig.*, 627 F.3d at 387). Mere assertions and "metaphysical doubt as to the material facts" will not defeat a properly supported and meritorious summary judgment motion. *Matsushita*, 475 U.S. at 586-87.

When a pro se litigant opposes summary judgment, his or her contentions in motions and pleadings may be considered as evidence to meet the non-party's burden to the extent: (1) contents of the document are based on personal knowledge, (2)

they set forth facts that would be admissible into evidence, and (3) the litigant attested under penalty of perjury that they were true and correct. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

Upon the parties meeting their respective burdens for the motion for summary judgment, the court determines whether reasonable minds could differ when interpreting the record; the court does not weigh the evidence or determine its truth. *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1018 (9th Cir. 2015). The court may consider evidence in the record not cited by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3). Nevertheless, the court will view the cited records before it and will not mine the record for triable issues of fact. *Oracle Corp. Sec. Litig.*, 627 F.3d at 386 (if a nonmoving party does not make nor provide support for a possible objection, the court will likewise not consider it).

Where both parties to a lawsuit file their own motions for summary judgment, "the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Tulalip Tribes of Wash. v. Wash.*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)).

## III.    DISCUSSION

The Court allowed Mitchell to proceed on his First Amendment access to information claim based on allegations that he sought a copy of his co-defendant's parole documents for use in a potential civil rights claim challenging the Parole Board's decisions denying parole to youthful offenders like Mitchell pursuant to the Supreme Court's decision in *Graham*. (ECF No. 7 at 5.) When the documents arrived at NNCC, Mitchell alleged Breitenbach did not let him view the documents and directed him to submit a records request through NDOC's Public Information Officer. (*Id.*)

Prisoners have a First Amendment right to receive information while incarcerated. *Jones v. Slade*, 23 F.4th 1124, 1134 (9th Cir. 2022) (citing *Clement v. Cal. Dep't of Corr.*,

364 F.3d 1148, 1151 (9th Cir. 2004)). At the same time, that principal must be balanced against the recognition that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Turner v. Safley*, 482 U.S. 78, 84 (1987) (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)).). Courts should accord prison officials great deference when analyzing the constitutional validity of prison regulations. *See Beard v. Banks*, 548 U.S. 521, 528-30 (2006); *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003); *Turner*, 482 U.S. at 84-85; *Jones*, 23 F.4th at 1134 ("We apply a deferential standard of review to challenges regarding prison regulations derived from *Turner*." (citations and internal quotation marks omitted)). A regulation that impinges on First Amendment rights "is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

Turner provides a four-factor test for determining whether a regulation is reasonably related to penological interests. First, there must be a "'valid, rational connection' between the prison regulation and the legitimate government interest put forth to justify it." *Turner*, 482 U.S. at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)). Second, the Court must consider whether there are alternative means of exercising the right left open to inmates. *Id.* at 90. Third, the Court must weigh "the impact [that] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* Finally, the Court looks for ready alternatives to the policy which would indicate that the policy may be an "'exaggerated response' to prison concerns." *Id.*

Mitchell argues he is entitled to summary judgment because the regulation supporting Breitenbach's refusal to release the public parole documents does not satisfy the *Turner* test. (ECF No. 32 at 2-6.) Mitchell argues withholding documents containing public information does not serve a legitimate penological interest because the same information is already accessible through other channels, such as televised news programs, newspapers, and legal publications such as Prison Legal News, and such the restriction is not rationally related to the stated goal. (*Id.* at 3-4.) Mitchell argues the

restriction is under-inclusive because NNCC allows inmates to watch television and receive newspapers. (*Id.*) Mitchell also argues he has no other means of accessing the actual record and that providing him with the record would not impact any prison resources. (*Id.* at 4-6.) Finally, Mitchell argues there is a "clear, ready alternative" of treating the parole document the same way the institution treats newspapers, televised broadcasts, and legal publications. (*Id.* at 6.)

Breitenbach argues she is entitled to summary judgment because Mitchell cannot establish a violation of his First Amendment right to receive information because Breitenbach relied upon AR 750.03(2) to restrict his access to the documents, which is reasonably related to legitimate penological interests. (ECF No. 34.) Breitenbach also argues she is entitled to qualified immunity. (*Id.*)

As explained above, AR 750.03(2) prohibits inmates from receiving, *from any source*, confidential information, which includes but is not limited to personal information about current or past inmates and any other person without that person's knowledge and written consent. Thus, the issue before the Court is whether AR 750.03(2) satisfies the *Turner* test.

### A.   Factor One – Valid, Rational Connection

First, there must be a "'valid, rational connection' between the prison regulation and the legitimate government interest put forth to justify it." *Turner*, 482 U.S. at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)). The first *Turner* factor is the most important. *Jones*, 23 F.4th at 1135. To evaluate whether a valid, rational connection exists, the Court must determine "whether the governmental objective underlying the policy is (1) legitimate, (2) neutral, and (3) whether the policy is 'rationally related to that objective.'" *Mauro*, 188 F.3d at 1059 (quoting *Abbott*, 490 U.S. at 414).

*Turner* has made clear that regulations that could not withstand constitutional scrutiny outside of the prison context may be acceptable inside an institution. *Id.* (citing *Beard*, 548 U.S. at 528 (plurality opinion) ("[T]he Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere.")). *Turner* neutrality is

not the "content neutrality" we demand in other areas of First Amendment jurisprudence. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech." (internal quotations and emphasis omitted)). Prison regulations of speech need not be content neutral like time, place, and manner restrictions, *see Pell v. Procunier*, 417 U.S. 817, 826-27 (1974), in fact, they may be content intensive. *See Turner*, 482 U.S. at 88 (distinguishing content-based prison regulations from true time, place, and manner restrictions). Thus, prison officials may restrict inmates' access to materials dealing with sex, violence, drugs, and gangs – censorship that we would not permit in other contexts. *Jones*, 23 F.4th at 1136.

Prison officials have more leeway regarding incoming mail due to greater security risks inherent in materials coming into a prison, *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989); thus, policies involving incoming mail are "valid if [they] are reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89. Prison officials are not required to show with certainty that any particular correspondence would have adverse consequences because prison administrators are given some latitude in anticipating the probable consequences of allowing a certain speech in and out of a prison environment. *Procunier v. Martinez,* 416 U.S. 396, 412 (1974), *overruled on other grounds* by *Thornburgh,* 490 U.S. at 413-14. Courts owe "substantial deference to the professional judgment of prison administrators." *Overton,* 539 U.S. at 132. Prison security is a legitimate and neutral penological interest. *Stefanow v. McFadden,* 103 F.3d 1466, 1472 (9th Cir. 1996) (recognizing prison security as a legitimate and "compelling" penological interest and upholding content-based confiscation of book advocating racism and violence); *see also Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Prison gangs in particular are a threat to inmate and staff safety, as well as to prison order. *See, e.g.*, *Wilkinson v. Austin,* 545 U.S. 209, 227 (2005).

Mitchell argues withholding documents containing public information does not serve a legitimate penological interest because the same information is already

accessible through other channels, such as televised news programs, newspapers, and legal publications such as Prison Legal News, and such the restriction is not rationally related to the stated goal. (*Id.* at 3-4.) Mitchell argues the restriction is under-inclusive because NNCC allows inmates to watch television and receive newspapers. (*Id.*)

Breitenbach argues that there is a valid, rational connection between AR 750.03(2) and the underlying policy of promoting inmate safety because it serves the goal of protecting an inmate's confidential and personal information. (ECF No. 34 at 5; ECF No. 34-1 at 3.) Breitenbach explains this is important because there are many gang affiliations within NDOC institutions and inmates are therefore prohibited from possessing the personal and confidential information of other inmates to prevent inmates from gleaning information about rivals in other gangs to facilitate attacks on them, whether during incarceration or after release. (ECF No. 34-1 at 3.) Breitenbach also argues that there is a distinction between accessing surface level information pertaining to other offenders through public media and possessing in-depth personal information about another inmate. (ECF No. 38 at 4.)

Here, Breitenbach provides evidence showing the policy is validly and rationally related to promoting prison safety by reducing the risk of prison gang violence. Prison gang activity has been recognized by the Supreme Court as imposing a threat to inmate and staff safety, as well as to prison order. *See, e.g., Wilkinson,* 545 U.S. at 227. Breitenbach is also not required to show that the specific documents in question would have any adverse consequences. *Procunier,* 416 U.S. at 412. Given the deference courts must show prison officials' professional judgment, Breitenbach has presented sufficient evidence to show AR 750.03(2) addresses prison safety and security concerns. *See e.g., Banks,* 548 U.S. at 516 (in disputed matters of professional judgment the court's inferences must accord deference to the views of prison authorities). As prison security is a legitimate and neutral penological interest, Breitenbach has provided evidence showing there is a valid, rational connection between AR 750.03(2) and the legitimate penological interest and thus the first *Turner* factor weighs in her favor. *Stefanow,* 103

F.3d at 1472.

### B.    Factor Two – Alternative Means

Second, the Court must consider whether there are alternative means of exercising the right left open to inmates. *Turner*, 482 U.S. at 90. Where "other avenues" remain available for the exercise of the asserted right, courts should be particularly conscious of the "measure of judicial deference owed to corrections officials. . . in gauging the validity of the regulation." *Id.* (citing *Jones v. North Carolina Prisoners' Union, supra,* 433 U.S. 119, 131 (1977), *Pell,* 417 U.S. at 827).

Here, Mitchell argues he has no other means of accessing the actual record. (ECF No. 32 at 4.) Breitenbach argues Mitchell had alternative means of exercising his right because he could have followed her instructions to send his request through the PIO, sought appointment of pro bono counsel who could review the records containing other inmate's confidential information, or utilized the law library to gather information from other legal proceedings. (ECF No. 34 at 5; ECF No. 36 at 6.)

The Court finds that alternative means of exercising the right to information exist because Mitchell was provided with the alternative of requesting information through the PIO, requesting appointment of pro bono counsel to review the documents, and accessing information from other legal proceedings through the law library. As other avenues to exercise the right exist and given the measure of deference required towards the professional judgment of prison officials, the Court finds that the second *Turner* factor weighs in favor of Breitenbach. *Turner*, 482 U.S. at 90.

### C.    Factor Three – Impact of Accommodation

Third, the Court must weigh "the impact [that] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. When accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials. *Id.* (citing *North Carolina Prisoners' Union,* 433 U.S., at 132-133). Courts must evaluate the policies of a

11

jail or prison with "due regard for the 'inordinately difficult undertaking' that is modern prison administration," recognizing that "certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison." *Thornburgh,* 490 U.S. at 407 (quoting *Turner,* 482 U.S. at 85).

Mitchell argues that providing him with the record would not impact any prison resources or create new security risks because inmates already have access to the same information through newspapers and television. (ECF No. 32 at 5-6.) Breitenbach argues that inmates cannot have access to the confidential information of other inmates to prevent inmates from learning information about rivals in other gangs to facilitate attacks on them. (ECF No. 34-1 at 3.) Breitenbach also argues the distinction between accessing information in the public media versus allowing inmates to receive in-depth personal information, such as social security numbers and gang affiliations, which are currently prohibited. (ECF No. 38 at 4.)

In this case, Mitchell seeks to have access to documents containing information about another inmate. The impact of accommodating Mitchell's right to access information would remove the prohibition on inmates receiving confidential information about other inmates, meaning that inmates would be able to learn information about rivals in other gangs and potentially facilitate attacks on them. This would undoubtedly cause a large "ripple effect" on guards, inmates, and the allocation of prison resources because it would mean a significant increase in the risk of inmate-on-inmate violence. Therefore, because the constitutional right "can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike[,]" the Court finds that the third *Turner* factor weighs in favor of Breitenbach. *Turner*, 482 U.S. at 92.

### D.    Factor Four – Ready Alternatives

Finally, the Court looks for ready alternatives to the policy which would indicate that the policy may be an "'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90 (citing *Block v. Rutherford,* 468 U.S. 576, 587 (1984)). Prison officials do not have to show that the subject policy is the "least restrictive alternative." *Id.* at 90-91. If an inmate

can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard. *Id.* at 91.

Mitchell argues that a "clear, ready alternative" is to treat the parole documents the same way the prison treats newspapers, televised broadcasts, and legal publications. (ECF No. 32 at 6.) Mitchell argues this would not impose any costs or create security concerns while fully protecting institutional goals and complying with Nevada law. (*Id.*) Breitenbach again argues the distinction between public media and the confidential information currently prohibited by AR 750.03(2), which is aimed at reducing the risk of prison gang violence. (ECF No. 38 at 4, ECF No. 34-1 at 3.)

As articulated above, treating documents containing confidential information concerning other inmates as though they were newspapers, television, or legal publications would mean significantly increase the risk of inmate-on-inmate violence. This would clearly cause a more than *de minimis* cost to prison security, which is a valid penological interest. *Turner*, 482 U.S. at 91; *Stefanow,* 103 F.3d at 1472. The Court therefore finds that the fourth *Turner* factor weighs in favor of Breitenbach.

Consequently, the Court finds that all four *Turner* factors weigh in favor of Breitenbach. *See Kirk v. Nevada Dep't of Corr.*, No. 3:17-CV-00334-RCJ-CLB, 2021 WL 1877831, at *3 (D. Nev. Apr. 15, 2021), *report and recommendation adopted*, 2021 WL 1877621 (D. Nev. May 10, 2021) (finding AR 750.03(2), which prohibits inmates receiving mail containing information regarding current or past NDOC inmates, satisfies the *Turner* factors). Thus, the Court concludes that AR 750.03(2) is reasonably related to a legitimate penological purpose and is valid under *Turner*. As such, Breitenbach is entitled to summary judgment in her favor and Mitchell's motion for summary judgment is denied.[5]

///

///

---

[5] As the Court finds that Mitchell's claim fails on the merits, it need not address Defendants' other arguments or defenses.

## IV.   CONCLUSION

**IT IS THEREFORE ORDERED** that Mitchell's motion for summary judgment, (ECF No. 32), is **DENIED**.

**IT IS FURTHER ORDERED** that Breitenbach's motion for summary judgment, (ECF No. 34), is **GRANTED**.

**IT IS FURTHER ORDERED** that this action be **CLOSED** and that judgment be entered accordingly.

**IT IS SO ORDERED**.

**DATED**: June 18, 2026.

_____

**UNITED STATES MAGISTRATE JUDGE**